## HASKILL, *ad.*, *v.* SEVIER, *ad.*, *et al.*

The warranty on a sale of slaves in 1860, that they were slaves for life, is not broken by the Constitution of the State, since adopted, emancipating them, so as to relieve the purchaser from paying the purchase money on the plea of failure of consideration.

The facts that a mortgage was written, signed and filed by the mortgagee in the recorder's office, for record, and afterwards found in the mortgagee's possession, is sufficient evidence of delivery.

A mortgage, which has not been acknowledged as prescribed by the statute, though irregularly recorded, creates no lien on the mortgaged property, as against creditors and subsequent purchasers, but is good as between the parties; and, on breach of the condition of payment, may be enforced against the mortgagee, and, on his death, against his administrator, in preference to his general creditors.

*Appeal from Arkansas Circuit Court in Chancery.*

Hon. WILLIAM M. HARRISON, Circuit Judge.

CLARK, WILLIAMS & MARTIN and BELL &·CARLETON, for appellants.

The mortgage, though unregistered, in pursuance of the

statute, was good and valid between the parties. *Maine v. Alexander, et al.*, *9 Ark., 112; 1 Hilliard on Mort., 663; 3 Bland, 126; 11 Ala., 691; 1 Dallas, 430; 4 Kent (3d ed.), 150; 2 Story's Eq. Jur., 1020, 1026.* An unregistered mortgage is good at law, and can be enforced in equity against all general creditors, and all who have not acquired a specific lien on, or entered in the mortgaged property. *2 Verm. Rep., 564; 1 Peere Williams, 277; 6 B. Mon., 606; 22 Ala., 190.*

An administrator takes the estate of his intestate subject to the liabilities of his intestate, and can set up no defense that his intestate could not. *2 Story Rep., 555, 492; 4 Dev. & B., 512; 2 Hill on Mort., 376.*

The subsequent emancipation of the slaves has no legal connection with or bearing upon the question, whether the negroes were in fact slaves for life; for it was only in case the warranty was true that they were slaves for life, that they could be emancipated. It is clear that at the time of the sale they were slaves for life, and, if emancipated by the subsequent action of the Government, the warranty was not broken.

WATKINS & ROSE and GARLAND & NASH, for appellees.

As between the parties here—the administrator, heirs and creditors of the mortgagor—the conveyance, which is the foundation of the bill, is of no validity, whatever might have been its force between the parties, the mortgagor and mortgagee. It is of no validity, because it is not acknowledged as the statute requires; and, therefore, it created no lien in favor of the mortgagee. *Gould's Dig., p. 799; sec. 1.* A deed not properly acknowledged is of no effect. *9 Ark., 112; 20 Ark., 190.* That the mortgagor deposited the deed in the recorder's office, can give it no additional validity, is clear.

In this case there was a total failure of consideration. The failure of consideration may not have been the fault of the creditor, surely it was not the fault of the mortgagor; and they, therefore, stand in the same position. The vendee, who

was not in default, obtained nothing by his purchase ; the vendor obtained payment to the full value of any permanent interest he conveyed, and equity will not enforce payment for a consideration that has entirely failed without fault of the purchaser, and entirely from the action of the Government

WALKER, C. J.

Langdon C. Haskill, as the administrator of the estate of Augustus M. Smith, deceased, filed his bill, in the circuit court of Arkansas county, against the heirs and administrator of the estate of John A. Jordan, deceased, and set forth therein, substantially, the following facts : That Augustus M. Smith, on the 8th day of March, 1860, sold to John A. Jordan, eighty-five negro slaves; for the price and consideration of eighty thousand dollars, and executed to him a bill of sale for said negroes, in which he warranted that he had a good title to them; that they were sound in mind and body, and were slaves for life.   Jordan paid to Smith twenty thousand dollars at the time of the purchase, and executed to Smith four several writings obligatory, by which he promised to pay him fifteen thousand dollars on the 8th of March, 1861, and a like sum on the same day in the years 1862–'63–'64; and, for the purpose of securing the payment of such writings obligatory, the said Jordan, on the 15th day of March, 1860, executed to Smith his deed of mortgage upon certain lands then owned by Jordan, situate in the county of Arkansas, which deed was filed by the clerk of said county, on the 22d of October, 1860, for record, and was by him recorded, but, as appears, without the acknowledgment of Jordan ; that the writing obligatory first due was paid by Jordan in his life-time, leaving the other three obligations unpaid ; that Jordan departed this life on the 15th of September, 1861; and that, subsequently, defendant, Sevier, was appointed administrator of his estate ; that Augustus M. Smith having also departed this life, the complainant, Haskill, was appointed administrator of his estate.   The writings obligatory remaining unpaid were duly authenticated by Haskill,

and presented to the administrator of Jordan's estate for allowance, which was refused, and the complainant filed his bill to foreclose said mortgage, and to subject the lands therein described, to sale, for the payment of such debt.

The defendant, Sevier, in his answer, insists that he stands in the relation of trustee for the heirs, and the several creditors of Jordan; that the deed of mortgage, although executed by Jordan, was never acknowledged by him, without which it was irregular to enter it of record, and that it created no lien whatever on the estate of Jordan; that if in other respects the claims of Smith are valid, which is denied, they stand upon the same footing with the claims of the other creditors of Jordan. He insists that the slaves (the consideration for which the writings obligatory were given) were not slaves for life, as they were warranted to be by Smith, but were thereafter, by an amendment of the Constitution of the State of Arkansas, emancipated and set free, and were no longer slaves; by reason whereof the consideration for such writings obligatory had wholly failed.

John C. and Benjamin Ricks, of New Orleans, creditors of Jordan, were, by consent of parties, permitted to intervene and assert their claims as such creditors; and thereupon, they set forth the same, denying that Smith acquired any lien by force of his mortgage against Jordan's estate.

By an agreement entered of record between the several parties, the facts set forth in the complainant's bill and in the defendant's answers are admitted to be true, and it is also admitted that the deed of mortgage is in the hand writing of Jordan, and was by him delivered to the clerk and recorder of the proper county, on the 22d day of October, 1860, for record.

Upon this state of facts, the case was submitted to the court below, for final hearing; upon consideration of which, a decree was rendered dismissing complainant's bill and for costs, from which he has appealed.

The defendants rely mainly upon two grounds of defense; the first of which is, that, as the writings obligatory were

executed for the payment of the purchase money for slaves, which were warranted by Smith to be slaves for life, which have since been emancipated by force of the Constitution and laws of this State, ordained and enacted since the date of the sale and warranty, the consideration for which the writings obligatory were given has failed, wherefore the administrator of Smith should not be permitted to enforce the payment thereof.

If this was a contract for the purchase and delivery of slaves—an executory and not an executed contract—the argument of the learned counsel might have controlling influence in our decision; but the contract between Smith and Jordan is an executed contract. The sale of the salves was an absolute sale, under which they passed into the possession of Jordan. It is true that Smith warranted the negroes to be slaves for life, and at the time of the warranty, that they were such is unquestionable. Smith's warranty related to the then existing not the future condition of the slaves, to which it could have had no reference; so, the warranty, that the negroes were sound in mind and body, was simply that such was their conditon at the time of the warranty, not that they might not thereafter become insane or diseased. The warranty could not have been intended to extend as against the power and authority of the Government to emancipate them in the future, because to such power he must of necessity submit, whether rightfully exercised or not. It is a principle that lies at the foundation of civil government, that private interests and rights must yield to public necessity or convenience, and when the sovereign will has been exercised, as in this case it was, whether justly or not, the citizen must of necessity submit. It might as well be contended that it was a breach of warranty of title and quiet possession where the lands thus conveyed had been condemned and appropriated to public use; yet, we apprehend, no one would contend that, for the exercise of this sovereign will, there would arise a breach of warranty; and, if not, for like reasons, no subsequent exercise of the sovereign power of the State could affect the warranty given by Smith in this

case. It was not a false warranty, when made, because the negroes were then slaves for life. Such we have held to be the law in *Dorris v. Grace, 24 Ark., 326.* The authorities to which counsel have referred, have reference to executory contracts alone—such, for instance, as if Smith had covenanted to sell and deliver to Jordan negro slaves by a certain day, but, before the day fixed for delivery, should the slaves be emancipated, whereby they cease to be property, and no longer subject to the control of Smith, he would be discharged from the performance of his contract. Thus it is said by *M. Hilliard, in his American Jurisprudence, page 103:* " If one contract to do an act which is possible and legal at the time, but which, before breach, becomes impossible by the act of God, or illegal by an ordinance of the State, even though such ordinance is unconstitutional, the obligation is discharged." So, in *Brewster v. Kitchen, 1 Ld. Raym., 321,* " Where a man covenants not to do a thing, which it was lawful for him to do, and an act of Parliament comes after and compels him to do it, then the act repeals the covenant." And so, also, in *Hudley v. Clark, 8 Durn. & East., 265,* where a ship-owner undertook to carry the plaintiffs' goods from Liverpool to Leghorn, and thereafter, and before the ship sailed, an embargo was imposed, which forbid the ship from sailing, this principle was fully recognized by *Lord Kenyon.* These cases clearly show the class of contracts to which this rule applies, and the extent to which it goes, and most clearly that they have no application to executed contracts, such as the one now before us.

We are not unmindful of the hardship and ruinous loss which have very often arisen out of circumstances connected with the late war, by which individuals, in consequence of acts not their own, have been made to suffer, but can not, on account of such hardship, depart from well established principles of law; to do so would open a wide and disastrous field of litigation.

If the warranty of servitude be held to be broken because of the Government act of emancipation, then every such warranty of servitude of a slave thus emancipated must, for a

like reason, be held to be broken, and a right of action for such breach would exist from the date of emancipation, although made fifty years ago, for time can not affect the principle; nor can the fact as to whether the purchase money was or was not paid. Fortunately for the country, the law sustains no such doctrine. We must, therefore, hold that the sale of the slaves made by Smith to Jordan was a valid sale; and, for aught that appears in this case, his title to the slaves was perfect; that his warranty was not a false warranty; that the consideration was just what the parties contracted for, and that Jordan took them subject to all the casualties by which, by the act of God or the sovereign power of the State, his title might be affected, and must, as all other purchasers do under like circumstances, bear the loss which subsequently arises, however sudden, complete or detrimental to his interests.

The next question to be considered is, did Smith acquire by his mortgage a lien upon the real estate of Jordan therein described? The deed is in the usual form, written by Jordan, signed by him with his proper signature, and delivered by him to the clerk and recorder of the proper county, to be recorded, and was recorded, and subsequently found in the possession of Smith. These facts, in the absence of evidence to the contrary, are sufficient evidence of a delivery of the deed. *Carnall v. Duval, 22 Ark., 126; Miller v. Physic, 24 Ark., 244.* But, as the deed was not acknowledged, it was irregularly put upon the record. *Section 1, chap. 117, Dig., page 799,* provides that mortgages shall be acknowledged before some person authorized by law to take the acknowledgment of deeds, and if, for land, shall be recorded in the county or counties in which the lands lie. The second section provides that every mortgage, whether for real or personal property, shall be a lien upon the mortgaged property from the time the same is filed in the recorder's office for record, and not before; which filing shall be notice to all persons of the existence of such mortgage. As a prerequisite to the admission of the mortgage to record, it should have been acknowledged before some competent officer, and as this appears

not to have been done, it created no valid lien upon the mortgaged property, as against creditors and subsequent purchasers, no matter whether they had actual notice of such prior mortgage or not. *Maine v. Alexander, 9 Ark., 112; Blagg v. Hunter, 15 Ark., 246; Jacoway v. Gault & Loop, 20 Ark., 190;* but as between the parties themselves, whether recorded or not, it was a valid instrument. Thus, in *Maine v. Alexander,* it was said "that although the mortgage was not acknowledged by the party who made it, yet it was a matter of which he could never take advantage; and that, as between the parties themselves, the lien became fixed and complete by the mere execution and delivery of the instrument."

Such being the case, the extent of its efficacy to secure to the mortgagee a lien upon the property of the mortgagor, under the peculiar circumstances of this case, is the main question to be decided.

Holding the mortgage, although not regularly recorded, to be valid, as between Jordan and Smith, its effect in equity was to furnish a security for the payment of the debt due from Jordan to Smith. *Kennedy v. McCown, 18 Ark., 170;* and after a breach of the conditions of the mortgage, by non-payment of the debt, it became a legal title, so as to enable him to oust the mortgagor by an action of ejectment. *McLean v. Cassiday, 18 Ark., 34; Gilchrist v. Patterson, id., 579.* In *Fitzgerald v. Beebe, 7 Ark., 319,* it was held that the mortgagee has three remedies, either of which he may pursue until his debt is satisfied. He may bring an action of debt on the bond, or get possession of the rents and profits of the land mortgaged by an action of ejectment, or he may foreclose the equity of redemption, and sell the land to pay his debt. In Massachusetts, it was held that a mortgage, although a pledge at first, becomes an absolute interest, unless redeemed at the time limited for the payment of the money. *Parsons v. Wells, 17 Mass., 421.* Approving these decisions, we must hold that, in equity, Smith had a security for his debt, which, after a breach of the condition of the mortgage for non-payment, matured into a legal

title, such as would entitle him to recover possession of the mortgaged property, by an action of ejectment, or to foreclose and sell by a proceeding in chancery. And such being the rights of Smith against Jordan, for satisfaction out of the mortgaged property, which, as appears, remained, at the time of Jordan's death, free from all other incumbrances, and consequently passed, at Jordan's death, to his heirs and legal representatives, with no other incumbrance except Smith's, the effect of which, after Jordan's death, presents the point of greatest difficulty. It is insisted, on the part of Jordan's administrator, in behalf of the creditors, and by the creditors themselves, who have been permitted to become parties herein, that although Smith might, at any time during the life of Jordan, after breach for non-payment, have foreclosed the mortgage, and subjected the mortgaged property to the payment of his debt, still, as this was not done, the mortgaged estate came to the hands of the administrator of Jordan's estate, as trustee, for the benefit of his creditors, free from all prior lien or incumbrance in favor of Smith over the other creditors of Jordan; and upon this point several authorities have been cited, by counsel on both sides, and, after a careful examination of them, we are of opinion that, upon the death of Jordan, the mortgaged estate passed into the hands of his administrator, charged with the incumbrance placed upon it by Smith's mortgage, as fully and to the same extent as it existed at the time of Jordan's death. Smith certainly, at that time, held a valid contract for the security of his debt, upon which he was entitled to a decree against Jordan, for the sale of the mortgaged premises, at any time after a breach for non-payment, or he might, by an action of ejectment, have taken possession of the property. These were the legal rights of Smith, under a valid contract, and surely it can not be said that Jordan's death in any manner affected the validity of the morgaged contract. If valid before his death, it was equally valid afterwards. Smith lost no legal right by the death of Jordan, and no greater estate survived to his heirs and administrator than

Jordan then possessed, but they took it subject to all such rights as previously existed. This question was fully discussed in *Fletcher v. Maury, 2 Story, 555.* In that case, Fletcher, Alexander & Co., filed their bill against George Maury, as assignee of the joint estate and effects of James Reed & Co., in which complainants claimed that they had acquired a lien on certain goods whilst the property of Reed & Co., and which came to the hands of the assignee. Judge STORY, who delivered the opinion of the court, said: "Now, before proceeding to the points more directly in judgment, it is proper to remark, that it is a perfectly well settled principle in equity, that the assignee in bankruptcy takes the property and the rights of the bankrupt, in the same plight and condition, and with all the equities attached thereto, in the same manner as the bankrupt himself held them. I recollect at present but one exception to the doctrine, and that is in the case of fraud." And in *Wisener v. McLean, id., 493,* it was held that the assignee of a bankrupt, except in cases of fraud, stands in no better situation than the bankrupt did to the parties. In *Baile v. Greenwood, 7 Wheat., 56,* Chief Justice MARSHALL quoted *Milford v. Milford, 9 Vesey, jr.,* in which it was held that the assignments from the commissioner in bankruptcy, like every other assignment, passed his rights precisely in the same plight and condition as he possessed them, and said: "Were it, then, completely settled that the vendor retains his lien against the assignees of a bankrupt, it would not follow that he retains it against creditors holding under a *bona fide* conveyance from the vendee." From which we may infer that the rule, which denies that the trustee takes the property subject to all its incumbrances created before the trust, is limited to liens created by *bona fide* conveyances, and others of like efficiency. So that we may concede all that is held by this distinguished judge, without affecting the equitable lien in this case; and as this decision is not, upon other grounds, reconcilable with the opinion delivered by the same judge in the case of *The Bank of Alexandria v. Hulbut, 1 Dal., 37,* nor with the case of *Fletcher v. Maury,* and *Warren*

11

*v. McLean*, in which the opinions were delivered by Judge STORY, who was on the bench, and a member of the court, when *The Bank of Alexandria v. Hulbut* was decided, we will not hold that case as an authority against these later decisions.

Admit that the administrator of Jordan stands in the relation of trustee towards the creditors of Jordan, still none of them except the complainant claims a lien under any conveyance whatever; they were merely general creditors, and had not placed themselves in a condition to contest with Smith his right to prior satisfaction out of the lands mortgaged, and therefore the parties stand before us thus: Smith has a valid and existing equitable lien on a part of Jordan's real estate, which, upon breach for non-payment, matured into a legal right to immediate possession; independent of this as creditor, his was an equal equity with the other creditors of Jordan, and is therefore clearly entitled to the benefit of the rule, "that, where equities are equal in other respects, the law shall prevail," and "he that hath only a title in equity shall not prevail against law and equity;" *Coote on Mortgages, 403;* that he who is first in time, who has laid hold on the estate and incumbered it with the payment of his own claim, even though imperfect in law, these superadded to his equal equity in other respects, make his the superior equity, and entitle him to satisfaction out of the particular estate thus incumbered. In according to the more vigilant creditor the benefit of his contract thus fairly made, we invade no right of the other creditors, any of whom might, by a like means, have secured to themselves a like security, which, if properly recorded, would have been superior to the complainant's lien, irrespective of the date of the contract, or might, by suit and judgment, have reached the same end; but, having failed to do this, they must not be permitted to contest with the complainant his superior claim to satisfaction out of the real estate mortgaged for that purpose.

Having thus disposed of the several questions of law presented for our consideration, it follows that the court below erred in rendering a decree against the complainant dismissing

his bill, and for this error the decree must be reversed and set aside, and the cause remanded to the court below, with instructions to render a decree in favor of the complainant in accordance with the prayer of his bill, with a provision therein that if upon sale of the lands mortgaged, or such tract thereof as may be necessary for the payment of the debt, interest and cost, there should be more money received from such sale than is sufficient for that purpose, that such excess shall be paid to the administrator of Jordan's estate, to be by him accounted for as assets thereof; but that if, after the sale of the mortgaged property, there remains a portion of complainant's debt unpaid, such balance shall be certified to the probate court, and there classed as of the class to which it would have been entitled, if allowed by the administrator of Jordan when presented for allowance, and paid according to its class, with the other general creditors of said estate; and that the appellee pay the costs in this court as well as in the court below.